IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRIDGEVIEW HEALTH CARE CENTER LTD., an Illinois corporation, individually and as the representative of a class of similarly-situated persons, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 09 C 5601 Magistrate Judge Maria Valdez |
| Plaintiff, | | |
| v. | | |
| JERRY CLARK, d/b/a Affordable Digital Hearing, | | |
| Defendant. | | |

# FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

In this certified class action, Plaintiff Bridgeview Health Care Center, Ltd., ("Bridgeview"), has sought recovery for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), for common conversion, and for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2. The claimed violations arise from Defendant Jerry Clark's alleged use of a third-party, Business-2-Business Solutions ("B2B"), to send advertisements via

---

[1] This order contains both findings of fact and conclusions of law. To the extent certain findings of fact may be deemed conclusions of law, they should also be considered conclusions of law. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they should also be considered findings of fact. *See Miller v. Fenton*, 474 U.S. 104, 113–14 (1985).

facsimile — sometimes known as "fax blasting" — to thousands of fax machines in Indiana and Illinois. This Court certified a class action on September 30, 2011. (*See* Doc. No. 96.)

The issues in this case and the parties' respective positions are stated in full in this Court's Memorandum Opinion and Order granting in part and denying in part Bridgeview's motion for summary judgment, *see Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2013 WL 1154206 (N.D. Ill. Mar. 19, 2013), and will not be repeated here. In that opinion, the Court granted summary judgment to Bridgeview on the issue of whether Clark was liable for facsimiles sent within a twenty mile radius of Terre Haute, Indiana, but denied summary judgment as to Clark's liability for facsimiles sent beyond that radius, finding that genuine issues of material fact existed as to whether B2B exceeded its authority in sending facsimiles outside of the twenty-mile radius. *Id*. at 12-14.

A one-day bench trial was held on the remaining issues in the case. Thereafter, the parties filed post-trial briefs, proposed findings of fact and conclusions of law, and supplemental authority for the Court's consideration. After careful review of these materials, along with the testimony and exhibits offered at trial, the Court finds that Bridgeview has failed to meet its burden of proving that Clark's is liable for facsimiles sent beyond a twenty-mile radius of Terre Haute by B2B. The Court therefore enters judgment in favor of Clark on that issue.

The following constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) on Bridgeview's claims against Clark.

## **FINDINGS OF FACT**

1. Plaintiff Bridgeview Health Care Center, Ltd., is an Illinois corporation with offices located in Bridgeview, Illinois. (Stipulated and Resolved Background Facts ("Stip.") ¶ 1.)

2. Defendant Jerry Clark is a resident of Casey, Illinois. (Stip. ¶ 2).

3. Clark operates a sole proprietorship under the name "Affordable Digital Hearing." (Stip. ¶ 2.)

4. Affordable Digital Hearing's business is based in the sale and servicing of hearing aids. (Jan. 27, 2014 Trial Tr. ("Tr.") at 20, 58.)

5. Clark's sale of hearing aids involves the testing and evaluation of hearing. If a customer requires a hearing aid, an impression of the person's ear is taken. After a new hearing aid has been made, customers return to Affordable Digital Hearing for final adjustments. (Tr. at 20, 59, 111.) With the exception of simple repairs, Affordable Digital Hearing sends hearing aids to the manufacturer for repair. (Tr. at 58.)

6. In June 2006, Affordable Digital Hearing had locations in Terre Haute, Indiana, and in Plainfield, Indiana. In June 2006, Clark operated and managed Affordable Digital Hearing's Terre Haute location and Jackie Swiger operated and managed the Plainfield location. (Stip. ¶ 3.)

7. As of June 2006, the Plainfield location had been open for five or six months. (Tr. at 22.)

8. Affordable Digital Hearing is a local business with a customer base that lives and works around Terre Haute, Indiana. (Tr. at 22:16-24.) Affordable Digital Hearing had Illinois-based customers across the border from Terre Haute but had never had customers, conducted business, or advertised in Chicago as of June 2006. (Tr. at 22:25-19.)

9. Clark advertised for Affordable Digital Hearing's Terre Haute location by newspaper, television, and direct mail. He advertised for the Plainfield location by newspaper two or three times. (Tr. 23:23-24:11.)

10. Since 2001, Affordable Digital Hearing has had a toll-free telephone number. Clark acquired the toll-free number so that his wife could call him from their home in Illinois and so that customers who lived nearby but were in different area codes could phone the Terre Haute location. There were three different area codes close to Terre Haute. (Tr. at 25:5-23.)

11. In early June 2006, Clark received a telephone call from "Kevin

4

Wilson," a representative of B2B, offering to sell Clark facsimile advertising services. (Tr. at 29:11–14.) Kevin Wilson was a false name used by B2B employee Conor Melville.[2] (Abraham Dep. at 83:22-25; 84:1-4.)

12. Clark had no communications with Wilson or any other B2B representative prior to receiving the telephone call from Wilson. (Tr. at 28:16-19.)

13. Before Wilson's contact with Clark, Affordable Digital Hearing had not engaged in facsimile advertising, and Clark had not considered engaging in facsimile advertising. (Tr. at 29:1-7.)

14. During the initial conversation between Clark and Wilson, Wilson told Clark that B2B could send facsimile advertisements locally and Clark informed Wilson that he was not interested. (Tr. at 29:11-14.)

15. Clark received a second phone call from Wilson a few days later. Wilson told Clark that many local businesses were using local facsimile advertising. Clark agreed to try B2B's facsimile advertising program. (Stip. ¶ 4; Tr. at 29:18-30:12.)

16. Clark authorized B2B to send facsimile advertisements within a twenty-mile radius of Terre Haute but did not authorize B2B to send ads outside of that radius. (Tr. at 30:21-31:1.)

17. Clark authorized B2B to send about 100 ads to local businesses with the understanding that only 100 ads would be sent. (Tr. at 31:2-12).

---

[2] Because Clark knew the B2B employee as Kevin Wilson, the Court will also refer to him as Kevin Wilson.

18. Clark did not authorize Wilson or B2B to send 6,000 ads. (Tr. at 31:13-17.)

19. Wilson told Clark the price for sending the 100 ads would be $279. Wilson did not explain how the price was determined. Clark thought the price was reasonable and did not question it. (Tr. at 31:18-23, 32:16-24.)

20. Neither Wilson nor B2B ever sent Clark a document that showed how B2B determined the price. (Tr. at 32:25-33:1.)

21. Wilson instructed Clark to pay for the broadcast by faxing B2B a voided check made out to B2B, and writing his client number on the memo line after he approved the final ad. (Tr. at 31:24-32:13.)

22. In June 2006, Clark was not aware of the TCPA or that sending unsolicited facsimile advertisements was illegal. Wilson did not inform Clark of those facts during their conversation. (Tr. 34:24-35:14.)

23. After their second phone conversation, Wilson faxed Clark instructions for what would be included in the facsimile advertisements for Affordable Digital Hearing. (Stip. ¶ 5; Joint Ex. 1.)

24. B2B sent Clark two or three sample ads to review and Clark selected an ad suggesting prospective clients "[t]ry the best supplier of hearing aids in Indiana, Affordable Digital Hearing." (Joint Ex. 1.)

25. When Clark selected the ad he wanted to have faxed and made changes to the ad, he added a reference to Affordable Digital Hearing's Plainfield

6

location because he thought some people at the outskirts of the twenty-mile radius around Terre Haute might have friends or family who would visit that location. (Tr. at 38:7–10; Joint Ex. 2.) Clark did not discuss sending faxes to the Plainfield area with Wilson. (Tr. at 38:11-16.)

26. In the ad selected by Clark, he wrote, "We'll repair any brand hearing aid $139, no shipping with a 6 month warranty." (Stip. ¶ 2; Joint Ex. 2.) Clark added the "no shipping" language to indicate that repaired hearing aids would be shipped to customers free of charge. (Stip. ¶ 2.) In 2006, Clark typically paid around $1.25 to ship repaired hearing aids to customers in the local area. (Tr. at 28:24-29:15.)

27. Clark also added Affordable Digital Hearing's toll-free number to the ad. Clark added the toll-free number so that his customers in surrounding local area codes 764, 217, and 618 could call his Terre Haute location toll-free. (Tr. at 39:22-25.)

28. Wilson sent Clark a final ad containing the changes Clark had made and Clark returned the ad by fax with the words "ad OK" written on it. (Stip. ¶¶ 7–9; Joint Ex. 3.)

29. Clark had no further communication with Wilson after sending him the corrected ad on June 27, 2006. (Tr. at 41:1.)

30. Clark never asked for or received a list of the numbers to which B2B would broadcast his ad. (Tr. 43:2-7.) The reason he did not ask for the list of fax numbers was because he "trusted [Wilson] would send them in what we talked

7

about, the twenty-mile radius of Terre Haute." (Tr. at 43:5-10.) Neither Wilson nor B2B ever informed Clark that the ads were sent. (Tr. at 41:3.)

31. None of Affordable Digital Hearing's customers told Clark that they ever received a faxed advertisement. (Tr. at 66:3.)

32. B2B's records indicate that a cover letter stating that 6,000 faxes would be sent in the broadcast was sent by fax to Clark. However, Clark never received or reviewed this document. (Tr. at 102:18-103:12.)

33. When presented with the information contained in the cover letter during his testimony, Clark acknowledged that the portion of the B2B cover letter stating "your advertising will reach thousands within a few short hours" was inconsistent with his understanding that the broadcast would be limited to 100 facsimiles. (Tr. at 101:16-22.)

34. Clark believed the proposed price of roughly $279.00 for 100 facsimiles he requested to be reasonable. (Tr. at 65:2-22.) He testified that he had no idea what it cost to send a fax in 2006. (Tr. at 64:3-4..)

35. Clark did not keep any records of his transactions with B2B except for the cancelled check authorizing the original broadcast. (Tr. at 102:18-103:18.)

36. Clark made his payment for the broadcast based on his recollection of the instructions he was given over the phone by Wilson in early June 2006. (Tr. at 104:7-18.)

37. Clark never put the restrictions he placed on the facsimiles to be sent by B2B in writing. (Tr. at 105:16-106:20.)

8

39. Clark was the only person to testify concerning his conversations with Wilson.

40. Caroline Abraham — B2B's proprietor — has never had any direct contact with Clark concerning facsimile advertisements for his business. (Tr. at 34:3; Abraham Dep. at 203:3.)

41. Abraham followed routine business practices in her fax broadcasting business, and her records concerning Clark show that she followed the same routine practices with regard to the faxes at issue in this case. Abraham's database records are consistent with the documentary evidence that has been produced in this case.

42. The Court finds that Abraham's testimony and her contemporaneous business records are evidence of B2B's general practices and what would have been the routine and regular practices of its employees.

43. Abraham testified that she did not recall any discussions of geographic limitations and did not remember any specific issue with respect to the dealings with the Defendant. (Abraham Dep. at 132:3-12.) In general, Abraham asserts that her practice is to do only what the customer wants. (Abraham Dep. at 166:7-9.) However, she also testified that there was no routine practice of noting any geographic limits or allowances on an agreement. Instead she testified that they "sometimes just calculate on the spot and didn't save the information." (Abraham Dep. at 132:3-16.)

9

44. Abraham's business records indicate that a facsimile cover letter and a payment instruction letter were sent to Clark on the dates reflected in Abraham's computer records. However, those records do not show that Clark ever received the letters. (Abraham Dep. at 191:7–194:12.)

45. Clark provided handwritten notes to assist in designing the facsimile ad. He also made revisions to the ad on two occasions. (Stip. ¶¶ 6–10.)

46. Neither Clark nor anyone employed by or associated with Affordable Digital hearing directed, controlled, or participated in the actual broadcast of the ads. (Tr. at 42:2-5.)

47. Neither Clark nor anyone employed by or associated with Affordable Digital hearing directed or controlled the means by which the ads were sent. (Tr. at 42:6-9.)

48. No representative of B2B ever told Clark where B2B obtained the names of businesses the ads were sent to. (Tr. at 42:10-13.)

49. Clark did not know and did not ask how B2B obtained the names of the businesses that received ads. (Tr. at 42:22-43:1.)

50. Clark did not ask for a list of businesses that fax ads for Affordable Digital Hearing would be sent to because he assumed that B2B would send ads to businesses within a twenty-mile radius of Terre Haute, per his oral instructions to Wilson. (Tr. at 43:5-10.)

51. Clark did not authorize Wilson or B2B to send ads to the following

areas: Cleveland, Ohio; Northern Indiana; Northern Illinois; the Chicagoland area; or Bridgeview, Illinois. (Tr. at 43:22-45:3.)

52. Affordable Digital Hearing has never had customers in Ohio, Northern Indiana, Northern Illinois, or the Chicagoland area. (R. 44:3-45:11.)

53. Neither Wilson nor anyone associated with B2B ever contacted Clark to request permission to send facsimile ads outside of a twenty-mile radius of Terre Haute. (Tr. at 45:4-8.)

54. No officer, director, shareholder, employee or agent of Bridgeview has personal knowledge concerning the receipt of the cover letter apparently sent to Clark by B2B. (Supp. Stip. ¶ 3.)

55. Clark's cost in toner and paper to receive a one-page facsimile is four cents. (Supp. Stip. ¶ 6.)

56. The Court finds that Clark's testimony concerning his instruction that B2B's broadcast of advertisements should be limited to 100 facsimiles in a twenty-mile radius and his testimony concerning subsequent contact with B2B to be credible. Clark is a small business owner running a one-man shop consisting of selling hearing aids, cleaning hearing aids, doing simple repairs on hearing aids, and shipping out to the factory those hearing aids in need of greater repair. (Tr. 58: 20-23.) At trial, he came across as man with no heightened sense of business acumen. In 2006 he generally sought to increase his business through direct-mail advertising. He would mail out advertising cards (sometimes with a coupon value) to approximately 100 people at fifty cents per card cost. After being solicited by B2B

11

for fax advertising in 2006, he agreed to have B2B send out fax advertisements for him for a cost of just under $280. Clark believed in 2006 that the higher costs of the fax transmission advertisement was due to the long distance toll costs, a belief that was incorrect.

## CONCLUSIONS OF LAW

57. Based upon the findings of fact summarized above and as stated by the parties and adopted by the Court, the Court concludes that Bridgeview has failed to prove by a preponderance of the evidence presented that Clark should be liable for unauthorized faxes sent outside of a twenty-mile radius of Terre Haute.

58. The TCPA, 47 U.S.C. § 227 makes it unlawful to send unsolicited facsimile advertisements.

59. The TCPA assigns liability to "any person" who sends an unsolicited facsimile advertisement, absent a qualifying exception. 47 U.S.C. § (b)(1)(C)(i)–(iii).

60. The TCPA does not contain language concerning vicarious liability for the acts of third parties, such as B2B. However, the TCPA's implementing regulations do create forms of vicarious liability whereby individuals and businesses may be liable for unsolicited facsimiles sent by third parties on their behalf.

61. The Court defers to the FCC's position that the TCPA incorporates traditional rules of vicarious liability. *See Bridgeview*, 2013 WL 1154206, at *5.

62. Vicarious liability under § 227(b) applies when a defendant's agent has apparent authority, actual authority or ratification from the defendant. *See In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 F.C.C.R. 6574, 6584, 2013 WL 193439, at *9 (2013).³ A defendant may be liable under § 227(b) for the acts of a third party, but only for those actions within the scope of authority the third party was granted. *See Bridgeview,* 2013 WL 1154206, at *5 (citing *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 F.C.C.R. 12391, 12407 (1995)).

63. A principal-agent relationship requires that the principal has the right to control the manner and method of work done by the agent, and the agent must be able to affect the legal relationships of the principal. *Glen Ellyn Pharmacy v.*

---

³ Bridgeview has encouraged the Court to follow guidance by the Federal Communications Commission giving "illustrative examples" of vicarious liability stemming from a seller giving a third-party marketing entity apparent authority. *See Dish Network*, 28 F.C.C.R., at 6592–93. Examples listed by the F.C.C. include a seller giving a marketing entity access to information regarding prices and servicing, giving authority to use a seller's name or trademark, or approval or review of marketing scripts. *Id.*, Each example offered by the FCC has taken place in this case. However, as the D.C Circuit recently explained, "the 'guidance' [contained in the FCC's declaratory ruling] has no binding effect on courts . . . is not entitled to deference under *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), and . . . 'its force is entirely dependent on its power to persuade.'" *Dish Network, LLC v. F.C.C.*, 552 Fed. Appx. 1, 2014 WL 323660, at *1 (D.C. Cir. 2014). To that end, the Court is unpersuaded by this aspect of the F.C.C.'s reasoning and declines to find that B2B had apparent authority to send faxes outside of the twenty-mile radius of Terre Haute. *See Creative Montessori Learning Ctr. v. Ashford Gear, LLC,* No. 09 C 3963, 2014 WL 865963, at *4 (N.D. Ill. Mar. 3, 2014) ("[B2B] could not act with apparent authority if it never had any authority to act.").

*Promius Pharma, LLC*, No. 09 C 2116, 2009 WL 2973046, at *3 (N.D. Ill. Sept. 11, 2009) (quoting *Oliveira–Brooks v. Re/Max Int'l, Inc.,* 865 N.E.2d 252, 258 (Ill. App. Ct. 2007)).

64. The principal can provide authority to the agent in advance or can ratify a previously unauthorized act after completion. *Id.* Either type of authorization makes the principal liable for the acts of the agent. *Id.*

65. It is possible for a principal to impliedly ratify the acts of her agent by failing to take action after receiving a benefit from the agent's activity – including notice of that activity – thereby creating the inference of "long-term acquiescence." *See Glen Ellyn Pharmacy*, 2009 WL 2973046, at *7 (quoting *Kulchawik v. Durabla Mfg. Co.*, 864 N.E.2d 744 (Ill. App. Ct. 2007)). However, "[i]f there is no benefit, ratification will not be implied." *Id.* (quoting *Horwitz v. Holabird & Root*, 816 N.E.2d 272, 279 (Ill. 2004)).

66. Clark did not directly transmit any facsimile ads to members of the class.

67. B2B was an independent contractor hired by Clark to disseminate facsimile advertisements.

68. Clark did not direct or control the means by which B2B faxed the ads in question in this case. Based on the evidence presented, Clark was responsible for the content of the ads sent and for approving the ads that were disseminated within a twenty-mile radius of Terre Haute. However, circumstantial evidence presented by Bridgeview is insufficient to overwhelm Clark's otherwise uncontroverted

testimony that he limited the number and geographic scope of the facsimiles to be sent during his conversations with Wilson.

69. Clark did not benefit from the facsimile advertisements sent outside of the twenty-mile radius by B2B, nor did he subsequently acquiesce to B2B having sent facsimiles outside of the twenty-mile radius. Thus, the Court finds that Clark did not ratify B2B's conduct in sending those facsimiles.

70. The evidence presented does not establish that Clark expressly or impliedly authorized B2B or any B2B representative to send facsimile ads outside of a twenty-mile radius of Terre Haute. The evidence does not show that Clark had any direct communication with Bridgeview, undermining any suggestion of actual authority on the part of B2B as Clark's agent.

71. "Apparent authority is the authority that a third person reasonably believes an agent to possess because of some manifestation from his principal . . . . Statements or manifestations made by the agent are not sufficient to create an apparent agency relationship." *Northern Assurance Co. of Am. v. Summers*, 17 F.3d 956, 962 (7th Cir. 1994) (quoting *Pepkowski v. Life of Ind. Ins. Co.*, 535 N.E.2d 1164, 1166 (Ind. 1989)).

72. B2B lacked apparent authority when sending facsimile advertisements outside of the twenty-mile radius of Terre Haute. The evidence derived from the Abraham and B2B submissions do not undermine the Court's factual findings.

73. In its summary judgement order, this Court found that Defendant hired B2B to send facsimile advertisements on his behalf. *Bridgeview*, 2013 WL 1154206, at *9. The Court found that Clark was liable for TCPA violations for ads faxed to thirty-two class members within a twenty-mile radius by B2B on his behalf. *Id.* at *8 (granting partial summary judgment to Bridgeview on the issue of facsimiles sent within a twenty-mile radius of Terre Haute). The Court's finding of liability against Clark for facsimile ads sent within a twenty-mile radius of Terre Haute stands. However, the Court declines to find Clark liable for additional facsimiles sent by B2B.

74. The Court further declines to find Clark liable for enhanced statutory damages provided for in the TCPA. *See* 47 U.S.C. § 227(b)(3)(C).

75. Pursuant to the Court's prior summary judgment order finding in favor of Plaintiff Bridgeview Health Care Center, Ltd. and against Defendant Jerry Clark, Clark is liable for damages in the amount of $500.00 per violation for thirty-two facsimiles sent within a twenty-mile radius of Terre Haute, Indiana, for a total award of $16,000.00. The Court finds no further violations and will not award any further damages.

**CONCLUSION**

For the reasons stated above, judgment is entered in favor of Plaintiff Bridgeview Health Care Center, Ltd. and against Defendant Jerry Clark in the amount of $16,000.00. Plaintiff is also entitled to an award of attorneys' fees. Plaintiff's fee motion must comply with Local Rule 54.3. Any response to the motion to be filed within thirty days thereafter, and any reply to be filed fourteen thereafter.

**SO ORDERED.**            **ENTERED:**

**DATE:**    November 21, 2014

                                                **HON. MARIA VALDEZ**
                                                **United States Magistrate Judge**